# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| ELECTRICAL WORKERS PENSION FUND, LOCAL 103, I.B.E.W., | Case No.: |
| Plaintiff, | JURY TRIAL DEMANDED |
| v. | |
| MICHAEL J. ANDERSON, STEVEN J. DEMETRIOU, JULIA L. JOHNSON, CHARLES E. JONES, DONALD T. MISHEFF, THOMAS N. MITCHELL, JAMES F. O'NEIL, III, CHRISTOPHER D. PAPPAS, SANDRA PIANALTO, LUIS A. REYES, LESLIE M. TURNER, JAMES F. PEARSON, STEVEN E. STRAH, and K. JON TAYLOR, | |
| Defendants, | |
| and | |
| FIRSTENERGY CORP., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................. 1

II.    JURISDICTION AND VENUE ...................................................... 8

III.   PARTIES ......................................................................................... 9

     A.    Plaintiff ............................................................................... 9

     B.    Nominal Defendant ............................................................ 9

     C.    The Individual Defendants ................................................. 10

          1.    The Director Defendants ......................................... 10

          2.    The Officer Defendants ........................................... 12

     D.    Relevant Non-Parties ......................................................... 13

IV.   FIRSTENERGY'S MISUSE OF CORPORATE FUNDS ............. 15

     A.    FirstEnergy's History of Corporate Governance and Oversight Failures............ 15

     B.    FirstEnergy Denies Shareholders' Demands for Political Spending Transparency ..................................................................... 18

     C.    The Director Defendants Consciously Ignored Persistent and Pervasive Red Flags as the Bribery Scheme Began ............................................ 22

     D.    The Director Defendants Consciously Ignored Further Red Flags Related to Householder and Generation Now as HB 6 was Passed................................. 26

     E.    The U.S. Attorney's Complaint Implicates FirstEnergy in the Largest Public Bribery Scheme in Ohio History ............................................. 31

     F.    The Fallout from the Bribery Scheme Continues ............................... 33

V.    THE DEFENDANTS VIOLATED SECTION 14(a) OF THE EXCHANGE ACT ....... 38

     A.    Defendants Issue False Proxies in Violation of Section 14(a) of the Exchange Act ..................................................................... 38

          1.    The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2018 Proxy ............................... 38

          2.    The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2019 Proxy ............................... 41

       3.     The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2020 Proxy ................................ 43

VI.    THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES ..................................... 46

    A.    General Duties of as Officers and Directors ........................................ 46

    B.    Obligations and Representation In the Company's Corporate Codes and Policies .................................................................................................. 48

VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS ..................................... 51

    A.    Demand is Excused Because the Director Defendants Face a Substantial Likelihood of Liability ......................................................................... 52

        1.     Demand is Futile Because the Director Defendants Face a Substantial Likelihood of Liability for Securities Laws Violations ........ 53

        2.     The Director Defendants Face a Substantial Likelihood of Liability for Failing to Exercise Their Fiduciary Duties to FirstEnergy ................ 55

    B.    Demand is Excused Because Certain Directors Are Not Independent ............... 57

VIII.    CLAIMS .................................................................................................................. 59

IX.    PRAYER FOR RELIEF ............................................................................................ 64

X.    JURY DEMAND ..................................................................................................... 65

## I.     INTRODUCTION

1.     Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Plaintiff"), a shareholder of FirstEnergy Corp. ("FirstEnergy" or the "Company"), by and through its undersigned counsel, brings this shareholder derivative action on behalf of FirstEnergy against the Company's current officers and directors identified below (collectively, "Defendants") arising from Defendants' breaches of fiduciary duties and violations of state and federal law from January 1, 2017 through the present (the "Relevant Period").[1] Plaintiff alleges the following upon information and belief, including investigation of counsel, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  The investigation encompassed, among other things: (i) the allegations by Ohio state and federal authorities in connection with the misconduct in this action and the criminal indictments arising therefrom, including case filings in *USA v. Householder, et. al.,* 1:20-cr-00077-TSB (S.D. Ohio) and *USA v. Borges*, 1:20-mj-00526 (S.D. Ohio); (ii) filings by FirstEnergy with the U.S. Securities and Exchange Commission ("SEC"); (iii) various investigative news articles concerning Defendants' misconduct; (iv) analysts research reports about FirstEnergy; and (v) company publications and information such as press releases, shareholder communications, conference calls and postings on the Company's websites.

2.     This stockholder derivative case arises from the largest political bribery scandal in the history of Ohio.  Indeed, it is likely one of the most egregious examples of a public corporation's management and board intentionally using stockholder funds to undermine the basic foundations of this Nation's system of representative government.

---

[1] While FirstEnergy is named as a nominal defendant herein, any reference to "Defendants" does not encompass the Company.

3.      In July 2020, Householder was arrested and criminally charged with crimes related to racketeering by the United States Attorney for the Southern District of Ohio.  The Indictment made unmistakably clear that FirstEnergy and various of its executives and/or board members are now the subject of criminal investigations by, among others, the U.S. Department of Justice ("DOJ").  Upon the filing of the Criminal Complaint (defined below) against Householder, First Energy's stock plummeted, erasing more than $7 billion in shareholder value almost instantly. Now, FirstEnergy itself is the subject of civil (and possibly criminal) investigations by, among others, the U.S. Securities and Exchange Commission ("SEC"), the Ohio Public Utilities Commission ("OPUC"), and the Ohio State Attorney General.  The damage to FirstEnergy from this bribery scandal already has been and will be staggering.

4.      The basic timeline surrounding these events makes the liability of the entire FirstEnergy Board self-evident.  In late 2016, FirstEnergy sought "legislative solutions" to rescue the Company from its dire financial straits.  At the same time, Householder, having resigned in disgrace from his former position as Speaker of the House in 2004 amidst accusations that he accepted kickbacks and traded legislation for campaign contributions, ran for office once again. Householder took office on January 3, 2017, and FirstEnergy flew Householder on the Company's private jet to Washington, D.C., to attend the presidential inauguration.  From then on, quarterly payments of $250,000 to a 501(c)(4) entity called "Generation Now" that Householder secretly controlled began.  From that point forward, FirstEnergy and its subsidiaries "donated" at least $60 million to various entities controlled by Householder.  Householder and his affiliates called FirstEnergy "the Bank" because of the "unlimited" funds the Company provided to accomplish its pay-to-play conspiracy.

2

5. Shortly after Householder's second term began in 2019, Defendants' bribery scheme achieved its objective: House Bill 6 ("HB 6") was introduced in the Ohio state legislature in early 2019, and the legislature passed the bill in July 2019. HB 6 provided a massive $1.3 billion bailout for FirstEnergy's uncompetitive power plants funded by monthly ratepayer surcharges, as well as other one-sided legislative amendments, including provisions that removed incentives to build renewable energy projects, canceled statewide energy conservation efforts, and allowed the Company to upcharge Ohio customers for their energy.

6. Media reports described HB 6 as the "worst energy bill of the 21st century," and observed that it was "overwhelmingly opposed by ratepayer groups, business groups, free market conservative groups, environmental groups, and Ohioans generally." Indeed, when HB 6 faced a statewide repeal referendum, FirstEnergy took the lead in opposing.

7. On July 17, 2020, the U.S. Attorney for the Southern District of Ohio filed an 80-page criminal complaint and affidavit (the "Criminal Complaint" or "FBI Affidavit") against Householder, two of FirstEnergy's lobbyists, and multiple members of Householder's staff. In announcing the Criminal Complaint and indictments, U.S. Attorney David DeVillers stated that "*[t]his is likely the largest bribery, money laundering scheme ever perpetrated against the people of the state of Ohio. This was bribery, plain and simple. This was quid pro quo.*"

8. The Criminal Complaint tied the bribery to an entity listed as "Corporation A." DeVillers all but confirmed FirstEnergy's direct involvement, stating: "Company A provided $60 million in return for the $1.3 billion bailout. *Everyone in this room knows who Company A is.*" DeVillers noted that "no one from the Company has *of yet* been charged," adding that "there are going to be a lot of busy FBI agents in the Southern District of Ohio . . . *this is by no means over*."

3

9. The Criminal Complaint detailed the criminal conspiracy, including many facts making inescapable that Defendants either knew of and participated in the fraud, or willfully disregarded the significant and pervasive red flags that should have alerted them to the staggering corruption that the Company was directly funding.

10. Accordingly, immediately after the Criminal Complaint was publicly disclosed, FirstEnergy's stock price plummeted by 45%, wiping out billions of dollars in shareholder value.

11. The Board cannot claim innocence or ignorance of senior management's actions in the political arena. Most basically, it is inconceivable that a board doing its job can "lose track" of $60 million of cash that gets funneled to bribe a major politician. What's more, the media has been raising questions about First Energy's political spending for years, since the Company itself has already been involved in prior scandals involving potential improper political influence.

12. But the most incriminating evidence that the Board was intentionally concealing management's bribery scheme is reminiscent of Shakespeare's line that "The lady doth protest too much." Specifically, the Board was repeatedly and specifically asked by the Company's stockholders to join the hundreds of other public corporations that detail their political spending, yet the FirstEnergy Board vigorously opposed all such efforts, insisting that stockholders take a "trust" approach based on the Board's supposed oversight of such spending.

13. Specifically, in recent years, Defendants actively opposed numerous stockholder proxy proposals to require the Company to make basic public disclosures about their use of corporate funds for political spending. Knowing, with the benefit of hindsight, what exactly FirstEnergy's Board and senior management were trying to hide, the Company's opposition to reporting political activity stands as a slap in the face to stockholders, and undermines critical guidance from the United States Supreme Court itself.

4

14.     In *Citizens United v. FEC*, 130 S. Ct. 876 (2010) ("*Citizens United*"), the U.S. Supreme Court removed statutory restraints on the ability of corporations to expend shareholder funds in connection with political activities. While *Citizens United* protected corporate political spending on First Amendment grounds, it justified the outcome squarely on the Court's expectation that corporate stockholders would receive full and fair disclosure of the corporation's political expenditures and could hold those managers accountability for abuse of power. Among other things, Justice Anthony Kennedy wrote for the majority as follows:

> Shareholder objections raised through the procedures of corporate democracy can be more effective today because modern technology makes disclosures rapid and informative. . . . . [P]rompt disclosure of expenditures can provide shareholders and citizens with the information needed to hold corporations and elected officials accountable for their positions and supporters. *Shareholders can determine whether their corporation's political speech advances the corporation's interest in making profits, and citizens can see whether elected officials are in the pocket of so-called moneyed interests.* 130 S. Ct. at 916 (emphasis added).

15.     Even more pointedly considering what the world now knows about FirstEnergy's lobbying efforts is the concurring opinion from Justice Antonin Scalia in *Doe v. Reed*, 130 S. Ct. 2811, 2837 (2010):

> Requiring people to stand up in public for their political acts fosters civic courage, without which democracy is doomed. For my part, I do not look forward to a society which, thanks to the Supreme Court, campaigns anonymously and even exercises the direct democracy of initiative and referendum hidden from public scrutiny and protected from the accountability of criticism. This does not resemble the Home of the Brave.

16.     Corporate shareholders have long been concerned about corporate political spending and transparency. In 2011, a former Chancellor of the Delaware Chancery Court publicly explained that when it comes to the use of corporate money to support political activities: "markets have to be able to know what in fact corporations are doing and I think that is essential. . . . *I think it's essential that there be reasonable disclosure of direct or indirect political spending*." (Emphasis added.) Similarly, in 2013, a group of institutional investors representing several

trillion dollars of capital wrote to the SEC that "[c]orporate political spending is risky business and opacity in corporate political spending only heightens these risks."

17.     Consistent with the U.S. Supreme Court's ruling in *Citizens United* and the guidance of corporate law jurists and institutional investors, different FirstEnergy stockholders pursued proxy proposals ***in each of 2015, 2016 and 2017*** to urge the Company's Board to make greater disclosure of the Company's political spending and lobbying.  The 2015 proposal made the following argument, among others: "***Lobbying expenditures can undermine our company's reputation with consumers and the public….***  Shareholders are concerned that the company's social license to operate may be at risk if the company continues to lobby against interests of consumers and the public. Additional disclosure is needed for shareholders to assess whether lobbying expenditures are in the best interests of stockholders and long-term value."

18.     The 2016 stockholder proxy proposal filing emphasized to shareholders that "FirstEnergy previously committed to greater transparency around its political spending . . . but has not fulfilled its commitment" and that "***inadequate disclosure by FE . . . present[s] significant risks . . . .***"  That proposal, which each Board member must have reviewed when preparing the Board's response, referenced an energy industry-focused report that found FirstEnergy to be among the companies "Most at Risk" in particular for the issues of "Corporate Political Activity Oversight & Disclosure" and "Political Spending and Public Policy Positions Disclosure."

19.     Despite these glaring red flags at FirstEnergy, and intense stockholder efforts to achieve disclosure of political spending, the Board recommended ***against*** the 2016 Proposal, and it failed.  Showing persistence, stockholders included a proposal in FirstEnergy's 2017 Proxy that would have again required FirstEnergy to prepare a report disclosing its lobbying expenditures. The 2017 Proposal again put Defendants on notice "that FirstEnergy's current lack of trade

6

association disclosure presents reputational risk. Absent a system of accountability, Company assets could be used for objectives contrary to FirstEnergy's long-term interests."

20.     Any Board acting in good faith would, at the very least, examine how corporate funds are being spent when devising a response to these totally appropriate stockholder requests. Strongly supporting the conclusion that the entire FirstEnergy Board was "in" on Householder's illegal bribery scheme, the Board consistently opposed any effort to provide proper disclosure. Instead, it paid lip service to providing candor while concealing the $60 million that mattered most.

21.     Instead, likely sensing that the tide was turning on this issue, the Board made assurances that it was addressing the issue of political spending in 2018 through 2020. However, the Board's words are an indictment of the whole Board and senior management team now that the $60 million bribery scheme is clear. The Company's 2017 Proxy affirmed that the Board's "Corporate Governance Committee maintains an informed status with respect to the Company's practices related to corporate political participation … ." And, the annual proxies in 2019 and 2020 affirmatively stated: "We have a decision-making and oversight processes in place for political contributions and expenditures."

22.     These statements, if true, are incompatible with any ignorance defense by the Board. While stockholders were pushing for better political activity disclosure and the Board was resisting actual disclosure while pressing a "trust us" message on the topic, Defendants were trying to corrupt Ohio's system of representative democracy.

23.     In short, Defendants willfully, repeatedly and brazenly failed to serve the best interests of FirstEnergy and its shareholders. As a result of Defendants' misconduct, FirstEnergy has and will continue to suffer massive damages and now faces a deeply uncertain future, including civil and criminal penalties, fines, and legal liabilities.

24.     As alleged below and will be shown at trial, Defendants must be held accountable to FirstEnergy for their sustained and systematic breaches of fiduciary duty, insider trading, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and other violations of state law.

## II.     JURISDICTION AND VENUE

25.     The claims asserted in this action arises in part under Section 14(a) of the Exchange Act, 15 U.S.C. § 78n(a), and SEC regulation 14a-9 promulgated thereunder, as well as Section 10(b) of the Exchange Act. This Court possesses jurisdiction pursuant to 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 1367(a) (supplemental jurisdiction over state law claims).

26.     This action is not a collusive one to manufacture jurisdiction that the Court otherwise would not have.

27.     Venue is proper in this Court because the events, acts, omissions, and false statements underlying Plaintiff's claims occurred in substantial part in this District, and FirstEnergy has suffered and will continue to suffer harm in this District. Cases pending in this District that arise from the harm alleged here include: (i) the Criminal Complaint; (ii) a number of class action complaints alleging violations of the federal securities laws[2]; (iii) two civil litigations against the Company for the complained of scheme by Ohio ratepayers[3]; and (iv) certain shareholder derivative actions[4].

---

[2] *Owens v. FirstEnergy Corp.*, No. 2:20-cv-03785 (S.D. Ohio) and *Frand v. FirstEnergy Corp.*, No. 2:20-cv-04287 (S.D. Ohio) (the "Securities Class Actions").

[3] *Smith v. FirstEnergy Corp.*, 2:20-cv-03755 (S.D. Ohio) and *Buldas v. FirstEnergy Corp.*, 1:20-cv-00593 (S.D. Ohio).

[4] *See, e.g.*, *Bloom, et al. v. Anderson, et al.*, No. 1:20-cv-04534-SDM-KAJ (S.D. Ohio) and *Stavely v. Anderson et. al.*, 2:20-cv-04598 (S.D. Ohio).

28. The Court has jurisdiction over each named defendant because such defendants are individuals who have sufficient minimum contacts with Ohio so as to render the exercise of jurisdiction by the Court permissible.

## III. PARTIES

### A. Plaintiff

29. Plaintiff Electrical Workers Pension Fund, Local 103, I.B.E.W. ("Plaintiff") is a pension fund based in Boston, Massachusetts that provides retirement benefits to active and retired Boston electrical workers. As of August 2020, Plaintiff had pension assets under management of approximately $1 billion.

30. Plaintiff has owned FirstEnergy common stock since at least January 2017, held continuously in FirstEnergy common stock through the Relevant Period, and is presently a stockholder of the Company. Plaintiff brings this action derivatively on behalf of FirstEnergy and its stockholders to redress injuries that the corporation suffered, and will suffer, as a direct result of Defendants' misconduct. Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in this litigation. Plaintiff intends to retain shares in FirstEnergy throughout the duration of this litigation.

### B. Nominal Defendant

31. Nominal Defendant FirstEnergy is an Ohio corporation headquartered at 76 South Main Street, Akron, Ohio 44308. FirstEnergy is one of the largest investor-owned utility companies, with its principal business being the distribution, transmission, and generation of electricity, as well as energy management and other related services. Amongst the Company's assets are two operating nuclear power plants in the State of Ohio: the Perry Nuclear Generating Station and the Davis-Besse Nuclear Power Station (the "Nuclear Power Plants"). The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "FE."

C.     **The Individual Defendants**

1.     **The Director Defendants**

32.     Defendant Michael J. Anderson ("Anderson") has served on the Company's Board since 2007, and presently chairs the Audit Committee and is a member of the Finance Committee. From at least 2016 through 2019, Anderson also served on the Corporate Governance and Corporate Responsibility Committee. From 2016 to 2019, Anderson was awarded $1,031,757 in fees, stock awards, and other compensation for his service on the Board.

33.     Defendant Steven J. Demetriou ("Demetriou") has served on the Company's Board since 2017 and is a member of the Finance Committee and the Operations, Safety and Nuclear Oversight Committee. Demetriou served on the Compensation Committee from 2018 through 2019. From 2017 through 2019, Demetriou was given $704,538 in fees, stock awards, and other compensation for his service on the Board.

34.     Defendant Julia L. Johnson ("Johnson") has served on the Company's Board since 2011. Johnson chairs the Corporate Governance and Corporate Responsibility Committee and serves as a member of the Finance Committee. From 2016 through 2019, Johnson was given $953,825 in fees, stock awards, and other compensation for her service on the Board.

35.     Defendant Charles E. Jones ("Jones") has served on the Company's Board and as Chief Executive Officer ("CEO") of FirstEnergy since 2015. Since at least 1978, Jones has worked in various management positions with the Company or its subsidiaries. From 2016 to 2019, Jones's total compensation (including base salary, stock options, etc.) comprised $55,207,422. Jones is a named defendant in the Securities Class Actions.

36.     Defendant Donald T. Misheff ("Misheff") has served on the Company's Board since 2012. He has been the Non-executive Chairman of the FirstEnergy Board since May 2018 and is also a member of the Audit and Corporate Governance and Corporate Responsibility

10

Committees. Misheff served on the Compensation Committee from 2016 through 2018.  From 2016 to 2019, Misheff was given $1,224,230 in fees, stock awards, and other compensation for his service on the Board.

37.     Defendant Thomas N. Mitchell ("Mitchell") has served on the Company's Board since 2016. Mitchell chairs the Operations, Safety and Nuclear Oversight Committee and is a member of the Corporate Governance and Corporate Responsibility Committee.  From 2016 to 2019, Mitchell was given $978,193 in fees, stock awards, and other compensation for his service on the Board.

38.     Defendant James F. O'Neil, III ("O'Neil") has served on the Company's Board since 2017.  O'Neil chairs the Compensation Committee and serves as a member of the Operations, Safety and Nuclear Oversight Committee.  He was also on the Audit Committee from May 2017 to May 2019.  From 2017 through 2019, O'Neil was given $739,825 in fees, stock awards, and other compensation for his service on the Board.

39.     Defendant Christopher D. Pappas ("Pappas") has served on the Company's Board since 2011. Pappas chairs the Finance Committee and serves as a member of the Compensation Committee.  From 2016 through 2019, Pappas was given $1,009,482 in fees, stock awards, and other compensation for his service on the Board.

40.     Defendant Sandra Pianalto ("Pianalto") has served on the Company's Board since 2018.  Pianalto is a member of the Compensation and Audit Committees and also served on the Finance Committee from 2018 through 2019. From 2018 through 2019, Pianalto was given $452,838 in fees, stock awards, and other compensation for her service on the Board.

41.     Defendant Luis A. Reyes ("Reyes") has served on the Company's Board since 2013.  Reyes is a member of the Corporate Governance and Corporate Responsibility Committee

11

and Operations, Safety and Nuclear Oversight Committee. From 2016 to 2019, Reyes was given $948,601 in fees, stock awards, and other compensation for his service on the Board.

42. Defendant Leslie M. Turner ("Turner") has served on the Company's Board since 2018 and serves a member of the Audit and Compensation Committees. From 2018 through 2019, Turner was given $314,836 in fees, stock awards, and other compensation for her service on the Board.

43. Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner are collectively referred to herein as the "Director Defendants."

### 2. The Officer Defendants

44. Defendant James F. Pearson ("Pearson") served as FirstEnergy's CFO from 2013 until March 2018. From March 2018 until his April 2019 retirement, Pearson served as Vice President of Finance. Since at least 1976, he held a number of positions with the Company or its subsidiaries, including in management. From 2016 to 2019, Pearson's total compensation was $22,803,462. Pearson is a named defendant in the Securities Class Actions.

45. Defendant Steven E. Strah ("Strah") is the President of FirstEnergy. Prior to becoming President in May 2020, Strah previously had served as FirstEnergy's Chief Financial Officer ("CFO") starting March 2018. Before March 2018, Strah served as Senior Vice President of FirstEnergy's Utilities Operations. He previously held various positions with the Company or its subsidiaries, since at least 1984, including a variety of management and senior management positions. From 2016 to 2019, Strah's total compensation was $16,848,974. Strah is a named defendant in the Securities Class Action.

46. Defendant K. Jon Taylor ("Taylor") is presently the Company's CFO. Prior to following Strah into the CFO position, he was the Company's Controller and Chief Accounting

Officer until March 2018, after which time he became President of FirstEnergy's Ohio Operations and, in 2019, Vice President of Utilities Operations. Taylor joined FirstEnergy in 2009 and progressed through various senior level financial positions. Taylor is named as a defendant in the Securities Class Action.

47.　Defendants Jones, Pearson, Strah, and Taylor are collectively referred to as the "Officer Defendants."

48.　Defendants Anderson, Biltz, Demetriou, Johnson, Misheff, Mitchell, O'Neil, Pappas, Pearson, Pianalto, Reyes, Turner, Strah, Taylor, and Turner are collectively referred to herein as the "Individual Defendants."

### D.　Relevant Non-Parties

49.　Larry Householder ("Householder") has been a member of the Ohio House of Representatives since January 2017 and was Speaker of the House from January 2019 until his removal on July 30, 2020. Householder previously was a House member representing Ohio's 72nd District from 1997 to 2004 and served as Ohio Speaker of the House from 2001 to 2004, before resigning after reports of alleged corrupt activity surfaced in the media and were publicly referred to the FBI. Householder personally benefitted from FirstEnergy as at least $300,000 in bribes were used to pay his legal fees and settle a lawsuit against him; over $100,000 paid for costs associated with his Florida home; and $97,000 went to campaign related expenses.

50.　Generation Now ("Generation Now") is a registered 501(c)(4) entity—i.e., a tax-exempt social welfare organization.　Under federal law, the names and addresses of contributors to 501(c)(4)s are not made available for public inspection.　From 2017 to the present, Generation Now received approximately $60 million from FirstEnergy and affiliates.

51.　Matthew Borges ("Borges") is a registered lobbyist for FirstEnergy Solutions ("FES"), a FirstEnergy subsidiary and a go-between for FirstEnergy and Generation Now.　The

FBI Affidavit alleges that Borges received $1.62 million in wire transfers from Generation Now. Borges diverted over $350,000 of the Generation Now payments from FirstEnergy to himself, calling FirstEnergy's flow of funds to Generation Now "Monopoly money."

52.     Juan Cespedes ("Cespedes") is a lobbyist retained by FES, the listed "lead consultant" seeking legislation that would save FES's failing Nuclear Power Plants.  The FBI affidavit has alleged that Cespedes "was in regular contact with both [FirstEnergy] and Enterprise members during the relevant period" and that toll records and search warrant returns reveal that "Cespedes coordinated the timely payment of $15 million from [FirstEnergy] to Generation Now." Cespedes received $227,000 from FirstEnergy in 2019 and approximately $600,000 from the Enterprise.

53.     Jeffrey Longstreth ("Longstreth") is Householder's longtime campaign and political strategist. According to the Criminal Complaint, "Longstreth led the messaging efforts both in the campaign to pass HB 6 and to defeat the referendum, and was a point of contact for [FirstEnergy]."  $5 million went from FirstEnergy to Longstreth, including at least $1 million that he transferred to his brokerage account in January 2020.

54.     Neil Clark ("Clark") is a professional lobbyist.  Clark owns Grant Street Consultants and previously served as a budget director for the Ohio Republican Caucus. Clark served as Householder's "'proxy' relating to [FirstEnergy's] matters" and in the Enterprise's efforts to further the enactment of HB 6 and ensure HB 6 went into effect in October 2019 by defeating the subsequent ballot-initiative challenge. Clark referred to FirstEnergy as the Enterprise's "Bank," and stated that the Company's "deep pockets" provided "unlimited" funds. Clark received at least $290,000 from FirstEnergy funds.

55. The FBI Affidavit refers to Borges, Cespedes, Clark, Householder, Longstreth, and Generation Now together as the "Enterprise," which was engaged in illegal racketeering.

## IV. FIRSTENERGY'S MISUSE OF CORPORATE FUNDS

### A. FirstEnergy's History of Corporate Governance and Oversight Failures

56. FirstEnergy is a utility company incorporated under Ohio law that generates, transmits, and distributes electricity through its subsidiaries and affiliates. It is one of the nation's largest investor-owned electric utilities. The Company's ten operating companies serve approximately six million customers throughout Ohio, Pennsylvania, West Virginia, Maryland, New Jersey, and New York.

57. FirstEnergy also owns and operates FirstEnergy Service Co. ("FESC"), a principal subsidiary that provides legal, financial, and other corporate support to its affiliated companies. FESC does not have its own CEO or board of directors, and was under the control and management of FirstEnergy and Defendants at all times during the Relevant Period.

58. The Board has five committees devoted to various areas of governance. These are the Audit Committee, the Compensation Committee, the Corporate Governance and Corporate Responsibility Committee, the Finance Committee, and the Operations, Safety and Nuclear Oversight Committee.

59. During the Relevant Period, FirstEnergy had a business segment known as Competitive Energy Services ("CES"). CES itself was primarily comprised of three legal entities: FirstEnergy Solutions ("FES"), FirstEnergy Nuclear Operating Co. ("FENOC"), and Allegheny Energy Supply. Through FES and FENOC, FirstEnergy owned, operated, and maintained two nuclear power plants in Ohio: the Perry Nuclear Generating Station (the "Perry Plant") and the Davis-Besse Nuclear Power Station (the "Davis-Besse Plant")—the two plants at the heart of the

15

bribery scheme.[5] Among the shared services FESC provided to FES were "external affairs," including "corporate contributions," "Federal/State/Local Regulatory Affairs," and "advocacy at the Federal, State, and Local Levels." Since at least 2003, FirstEnergy's long history of major corporate governance and oversight failures have subjected the Company to tens of millions of dollars' worth of liability for its repeated violations of shareholder and public trust, including:

    a.    A derivative action brought in September 2003 alleging breach of fiduciary duty by the Board for ignoring repeated signs of inadequate and decaying equipment at the Company's Davis-Besse Plant, failing to maintain emergency control systems and neglecting to establish an adequate financial reporting system. The result of the gross mismanagement of the Board of Directors was the most serious nuclear plant incident since the Three Mile Island accident in 1979 and the largest electrical blackout in United States history, leading to nearly 100 deaths and resulting in hundreds of millions of dollars in damages and remedial costs.

    b.    A joint U.S.-Canadian investigation, led by the U.S. Secretary of Energy and Canada's Minister of Natural Resources, faulted FirstEnergy for the August 2003 power blackout, finding that FirstEnergy bore overwhelming responsibility for the blackout by violating operating guidelines due to "long-standing institutional failures and weaknesses" that "could have been prevented" and citing numerous violations by

---

[5] Following a March 2018 bankruptcy and later reorganization, FES and FENOC were renamed Energy Harbor LLC (a subsidiary of Energy Harbor Corp.) and Energy Harbor Nuclear Corp., respectively. Energy Harbor Corp. emerged from bankruptcy on February 27, 2020. Although these subsidiaries were separated and deconsolidated from FirstEnergy's financial results, the Company continued to have numerous, material financial entanglements with FES involving the conspiracy to pass HB 6 as detailed herein.

FirstEnergy of North American Electric Reliability Council standards governing systems maintenance.[6]

    c.    In 2004, it was revealed that FirstEnergy bribed Robert Tongren, then-Executive Director of Ohio's Office of Consumers' Counsel, with gifts totaling to a value of $2,000 in exchange for Tongren's destruction of an unpublished consultant report that cost taxpayers $579,000, despite the fact that newspapers repeatedly filed public records requests for its release. The destroyed report disputed FirstEnergy's claim to recoup up to $8.8 billion from ratepayers for its nuclear power plants in Ohio, finding instead that the appropriate amount was between $2.2 billion and $4 billion. The relationship between FirstEnergy and Tongren eventually came to light and Tongren resigned under pressure from state officials and consumer groups.[7]

    d.    In 2006, FirstEnergy entered into a deferred prosecution agreement involving a "full admission of responsibility" for lying to the Nuclear Regulatory Commission about the dangerous conditions at FirstEnergy's Davis-Besse Plant and paid a record $28 million fine. Assistant Attorney General Sue Ellen Wooldridge of the Department of Justice's Environmental and Natural Resources Division announced that

---

[6] U.S.-Canada Power System Outage Task Force, "Final Report on the August 14, 2003 Blackout in the United States and Canada: Causes and Recommendations" at 17-19 (Apr. 2004), available at https://www.energy.gov/sites/prod/files/oeprod/DocumentsandMedia/BlackoutFinal-Web.pdf.

[7] "Consumer watchdog on Ohio utility's leash?" The Blade (Mar. 24, 2004), available at https://www.toledoblade.com/State/2004/03/24/Consumer-watchdog-on-Ohio-utility-s-leash.html.

"[b]y misleading the [Nuclear Regulatory Commission] about its prior safety inspections, FENOC failed to meet its regulatory obligations and violated the public's trust."[8]

60.     Accordingly, by the start of the Relevant Period, Defendants knew that FirstEnergy suffered from a decades-long history of corporate governance and oversight failures that had the potential to cause massive damages to the Company and its shareholders.

**B.     FirstEnergy Denies Shareholders' Demands for Political Spending Transparency**

61.     In 2016, a nonprofit research organization dedicated to corporate governance and accountability—the Investor Responsibility Research Center Institute (the "IRRCI")—found that of the top 25 electric utilities in the U.S., FirstEnergy had the second highest level of political spending relative to its revenues, yet ranked among the lowest in key performance indicators of corporate political activity oversight and disclosure.[9]   The IRRCI also reported that while FirstEnergy had "far and away the most intensive political activity spending,"[10] it also had "no disclosure about their public policy positions," evaluating FirstEnergy as among the companies "Most at Risk" for liabilities related to "Political Spending and Public Policy Positions Disclosure."[11]

---

[8]     "FirstEnergy Nuclear Operating Company to Pay $28 Million Relating to Operation of Davis–Besse Nuclear Power Station," Department of Justice (Jan. 20, 2006), available at https://www.justice.gov/archive/opa/pr/2006/January/06_enrd_029.html.

[9]  The Top 25 U.S. Electric Utilities: Climate Change, Corporate Governance and Politics; Sustainable Investments Institute at 51, 76 (Apr. 14, 2016), available at https://www.weinberg.udel.edu/IIRCiResearchDocuments/2016/04/FINAL-Climate-Change-Corporate-Governance-and-Politics.pdf.

[10] *Id.* at 52.

[11] *Id.* at 14.

62. In fact, in the Company's 2015 annual proxy, a shareholder proposal was included that would have required FirstEnergy to prepare an annual report disclosing its lobbying expenditures (the "2015 Shareholder Proposal"). The 2015 Shareholder Proposal advocated for FirstEnergy to report:

> (1) Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications[;] (2) Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient[;] (3) FirstEnergy's membership in and payments to any tax-exempt organization that writes or endorses model legislation[; and] (4) Description of the decision making process and oversight by management and the Board for making payments described in section 2 above.

63. In support, shareholders noted in the 2015 Shareholder Proposal that, despite FirstEnergy's agreeing "to report annually on its political campaign contributions" in 2007, "FirstEnergy has not disclosed any record of its political spending" since its inaugural 2009 report. The 2015 Shareholder Proposal further noted that "shareholders are missing key information needed to assess our company's efforts to influence public policy" because FirstEnergy did not disclose "lobbying to influence legislation in states." The shareholders recognized that the Company's lack of transparency posed significant risks, stating, "Shareholders are concerned that the company's social license to operate may be at risk if the company continues to lobby against interests of consumers and the public. Additional disclosure is needed for shareholders to assess whether lobbying expenditures are in the best interests of stockholders and long-term value."

64. The following week, shareholder Green Century Capital Management ("Green Century") filed a Form PX14A6N with the SEC encouraging shareholders to vote for the 2015 Shareholder Proposal, criticizing the lack of transparency and oversight with FirstEnergy's lobbying activities. In support of the 2015 Shareholder Proposal, Green Century pointed out that "Shareholders . . . have no way of knowing whether there are appropriate oversight mechanisms

in place to ensure FirstEnergy's lobbying activities to influence the regulatory and legislative processes are in the best interest of the company and its shareholders."

65.     Despite strong policy rationale and shareholder support for the passage of the 2015 Shareholder Proposal, FirstEnergy recommended that shareholders vote against it and it failed to pass.

66.     Again, in March 2016, FirstEnergy's annual proxy included the same proposal by shareholders as had been included the previous year to require FirstEnergy to prepare a report disclosing its lobbying expenditures (the "2016 Shareholder Proposal").

67.     In support of the 2016 Shareholder Proposal, on May 5, 2016, FirstEnergy shareholder The Nathan Cummings Foundation filed a Form PX14A6N with the SEC which raised alarm about FirstEnergy's "ineffective and risky" lobbying strategy and failure to provide transparency and oversight over its political activities.  The filing cited a news article that FirstEnergy was making a "risky bet on the past" by lobbying for price subsidies for its non-renewable energy plants, noting the Federal Energy Regulatory Commission's decision to overturn price controls that FirstEnergy had obtained for its nuclear power plants through lobbying efforts which resulted in Moody's downgrading the outlook on FirstEnergy's debt to negative from stable.

68.     Despite strong policy rationale and shareholder support for lobbying disclosures, the Board again recommended that shareholders vote against the 2016 Shareholder Proposal and it failed.

69.     Once again, in 2017, FirstEnergy's Proxy included a shareholder proposal that would have again required FirstEnergy to begin reporting its lobbying expenditures (the "2017 Shareholder Proposal").

70.     The 2017 Shareholder Proposal again put Defendants on notice that "Absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." Despite strong policy rationale and shareholder support, the Board again recommended that shareholders vote against the 2017 Shareholder Proposal, and it also failed.

71.     However, each of the 2015, 2016, and 2017 Shareholder Proposals received a substantial amount of shareholder support, with the number of shares supporting the measure increasing each year with 60,088,566 voting For in 2015, 80,145,360 voting For in 2016, and 133,463,630 voting For in 2017.

72.     In light of vocal and growing shareholder support for political lobbying disclosures, and despite having opposed the proposals, the Board paid lip service to reform in the following year's proxy statement.  In the 2018 proxy, the Board claimed that it had "enhanced" its oversight and disclosure function, purporting to have "further strengthened its oversight of [the] Company's lobbying activities and amended the Corporate Governance Committee's Charter to clarify this responsibility."

73.     In reality, as detailed below, while Defendants were on notice of oversight issues related to political expenditures and lobbying, and even claimed to have a process in place for reviewing such expenditures, the Board utterly failed in their duty of oversight for several years, disregarding numerous red flags, media scrutiny, and concern from shareholders and expert analysts.  In light of the fact that the Company's pursuit of "legislative solutions" was essential to its future success, the Company's internal controls and procedures related to lobbying and political contributions were mission-critical.  But Defendants' failure to stop the Company from funding and participating in a widespread, years-long criminal bribery scheme that subjected FirstEnergy

to massive legal, business, and reputational harm and liabilities demonstrates that any purported

oversight mechanisms related to political expenditures and lobbying were wholly illusory.

### C. The Director Defendants Consciously Ignored Persistent and Pervasive Red Flags as the Bribery Scheme Began

74. By 2016, due to weakening demand for electricity and historically low prices in

wholesale energy markets, FirstEnergy's nuclear generation operation had become financially

unsustainable. In its 2016 Form 10-K, FirstEnergy recorded a non-case pre-tax impairment charge

of $800 million, recognized in the second quarter of 2016, "representing the total amount of

goodwill at CES."  In light of this write-down and the Company's inability to profitably compete

in the nuclear electricity generation market, FirstEnergy announced in the 2016 Form 10-K:

> Although FirstEnergy is targeting mid-2018 to exit from competitive operations, the options for the remaining portion of CES' generation are still uncertain, but could include . . . Legislative or regulatory solutions for generation assets that recognize their environmental or energy security benefits[.]

75. On the Company's earnings call the next day, February 22, 2017, Jones expanded

on the "legislative solution" FirstEnergy was considering for the Perry and Davis-Besse Plants: a

bailout, sponsored by the state of Ohio.  Jones explained:

> In Ohio, we have had meaningful dialogue with our fellow utilities and with legislators on solutions that can help ensure Ohio's future energy security. . . . We are advocating for Ohio's support for its two nuclear plants, even though the likely outcome is that FirstEnergy won't be the long-term owner of these assets.  We are optimistic, given these discussions we have had so far and we will keep you posted as this process unfolds.

76. Additionally, Jones discussed FirstEnergy's continued support of FES (and its

subsidiary FirstEnergy Nuclear Generation) and its efforts to obtain subsidies:

> In addition to the $500 million credit facility provided to FES by FirstEnergy that provides for ordinary operating liquidity needs, FirstEnergy is now working with FES to establish conditional credit support on terms and conditions to be agreed upon for the $400 million FES parental support agreement that is currently in place, benefiting FE Nuclear Generation.

77.     Despite its lobbying efforts, however, multiple attempts to obtain a "legislative solution" to FirstEnergy's fiscal problems failed to pass, including several proposals in 2017 contained in House Bill 178, Senate Bill 128, and House Bill 381.

78.     As FirstEnergy continued to search for a solution to its nuclear plant problems, disgraced former Speaker of the Ohio House Larry Householder, who had left the position in 2004 amidst a bribery and kickback scandal involving campaign vendors for the Republican caucus, returned to Ohio politics, winning the November 2016 election for the House seat in Ohio's 72nd District.

79.     Householder's ultimate goal was to return to the Speaker position in the 2018 election cycle.  Thus, upon his election to the state legislature, Householder and his co-conspirators proceeded with their plan to raise money and support "a team of electable candidates who would support Householder's bid for speakership."[12]

80.     Householder assumed the House seat on January 3, 2017.  Days later, Householder flew on FirstEnergy's private jet to Washington, D.C. to attend the presidential inauguration, and the bribery scheme with FirstEnergy was set in motion.  Following this trip, beginning in March 2017, Householder began receiving quarterly payments of $250,000 from FirstEnergy and FirstEnergy subsidiary FESC, into a bank account of an entity called Generation Now, a 501(c)(4) entity that Householder secretly controlled and that was incorporated just one month previously, in February 2017.  Despite the omission of Householder's name from the account, there can be no dispute that Householder was the true owner: Clark, a lobbyist and Householder's co-conspirator,

---

[12] ¶70. (References to "¶__" are to the FBI Affidavit.)

stated in a recorded conversation that "it's secret, a (c)(4) is secret. Nobody knows the money goes to the Speaker's account" and later explained that "Generation Now is the Speaker's (c)(4)."[13]

81.    As the Company continued funding Generation Now, the agreement was clear: FirstEnergy would support the candidacies of Householder and his allies in the upcoming 2018 election, in exchange for the legislative relief that was crucial to the Company's future. From 2017 to 2018, Generation Now would spend about $3 million in money funneled from FirstEnergy to support the election bids of Householder and nearly two dozen different candidates friendly to Householder who would then vote for his elevation to Speaker. Indeed, most of these candidates won the 2018 general election; they all voted to name Householder as Speaker; and all but two eventually voted for FirstEnergy's bailout.

82.    FirstEnergy used FirstEnergy Service, as well as another entity it controlled, known in the FBI Affidavit as "Energy Pass-Through," to funnel the payments to Householder. Money that FirstEnergy paid to Generation Now was also used to pay for Householder's reelection staff (which otherwise would have been paid by Householder's candidate committee), which gave Householder a competitive edge over his opponents. Householder also used FirstEnergy's money, laundered through Generation Now, to purchase at least $97,000 worth of mail and radio advertisements in his district.

83.    Between the time when Generation Now's bank account was first opened in February 2017 and the 2018 general election, FirstEnergy funneled nearly $2.5 million into Generation Now.[14] In addition, FESC funneled an additional $500,000 to a dark money group

---

[13] ¶¶46, 50.
[14] ¶82.

associated with the conspiracy in October 2018, bringing FirstEnergy's total bribery payments to $2.9 million.[15]

84.    At the same time that FirstEnergy was funneling millions of Company dollars to Householder and his allies through Generation Now, senior FirstEnergy Executives were in regular contact with Householder and his allies in furtherance of their illicit scheme.  The FBI Affidavit lays out numerous phone calls between Householder and his affiliates and FirstEnergy executives on significant days in the 2018 election cycle that "corroborate the close coordination" among the members of the bribery scheme.[16]

85.    These illicit payments were kept hidden from the public.  By mid-2018, however, state campaign records showing FirstEnergy's contributions of about $149,000—a drop in the bucket compared to the concealed payments—to Householder and his legislative allies through the Company's political action committee drew media attention.  An April 20, 2018 article noted FirstEnergy's close ties with Householder, including the 2017 flight to the presidential inauguration on FirstEnergy's private jet, and raised serious questions, stating, "[i]t's unclear exactly why FirstEnergy decided to put so much money behind Team Householder."[17]  The article reported that FirstEnergy enjoyed the support of Householder and his allies, as they co-sponsored a failed House Bill 381, which would have allowed "FirstEnergy subsidiaries to charge customers about $2.50 more per month to subsidize the Davis-Besse and Perry nuclear power plants in

---

[15] ¶83.

[16] ¶¶84-85.

[17] Jeremy Pelzer, "FirstEnergy PAC writes big checks to House speaker hopeful Larry Householder, campaign allies," *Cleveland.com* (Apr. 20, 2018), available at https://www.cleveland.com/open/2018/04/firstenergy_pac_writes_big_che.html.

northern Ohio." According to the piece, when asked, a FirstEnergy spokesperson refused to "directly say why the company's PAC made the contributions."

86.     On July 18, 2018, *Cleveland.com* published an article entitled "Dark money groups spent millions on Ohio legislative races," which discussed dark money funding of ads in Republican House primaries, including one "pro-Householder" political action committee funded by Generation Now and supportive of the House Bill 381 subsidy of the Company's two nuclear plants.[18] The article reported that the group "raised $1 million from a single donor—a social welfare group registered in Delaware called Generation Now." Growth & Opportunity used Generation Now, and thus FirstEnergy, money to promote House Bill 381, "which would subsidize two nuclear power plants in Ohio owned by FirstEnergy, the financially troubled utility company."

87.     Despite the fact that the basic elements of the bribery conspiracy were captured in these news reports, Defendants took no action to address the misconduct that was already over a year in progress. Defendants failed to fulfill their oversight duties in investigating, identifying and redressing FirstEnergy's role in funding dark money groups, nor did they investigate or otherwise address the Company's connection with Householder and Generation Now.

### D.     The Director Defendants Consciously Ignored Further Red Flags Related to Householder and Generation Now as HB 6 was Passed

88.     FirstEnergy wired a total of $1.5 million to Generation Now between August and October 2018 and an additional $500,000 to a dark money group set up by Householder's co-conspirator.[19] The FirstEnergy-backed scheme worked, with all of Householder's allies in the

---

[18] Andrew Tobias, "Dark money groups spent millions on Ohio legislative races," *Cleveland.com* (July 18, 2018), available at https://www.cleveland.com/open/2018/07/dark_money_groups_ spend_millio.html.

[19] ¶96.

2018 election winning with the support of the funds from FirstEnergy.[20]  All of those candidates went on to vote to make Householder Speaker, and he assumed the position in 2019.

89.     Having secured the Speakership, Householder set out upholding his end of the bargain.  The very day that Householder was elected Speaker, he pledged to create a standing subcommittee on energy generation, which was created for the sole purpose of proposing and passing HB 6, introduced on April 12, 2019.[21]  HB 6 was designed to prevent the shutdown of FirstEnergy's nuclear plants by creating a $9 subsidy per megawatt hour of energy produced by nuclear or solar generators.  The subsidy would be funded by instituting a monthly fixed charge on all residential, commercial, and industrial consumers.  FirstEnergy would collect approximately 94% of the subsidy, which would total more than $160 million annually, as FirstEnergy's nuclear plants produced over 18.3 million megawatts in 2018 alone compared to just 1,095 megawatts produced by Ohio's six combined solar facilities.  Newspapers immediately characterized HB 6 as a "bailout" for FirstEnergy.[22]

90.     At a press conference on April 12, 2019, the day that HB 6 was introduced, when asked where the amount of the subsidy came from, Householder admitted, "[F]or two years I've had this in my head."  As described above, Householder received his first $250,000 payment from FirstEnergy roughly two years prior to the introduction of HB 6, in March 2017.

---

[20] ¶106.

[21] ¶116.

[22] *See, e.g.,* Jessie Balmert, "Ohio House Passes Bill to Bail Out Nuclear Plants in Northern Ohio," *Cincinnati Enquirer* (May 29, 2019), available at https://www.cincinnati.com/story/news/politics/2019/05/29/ohio-house-passes-nuclear-plant-bailout/1270558001/; Tom Henry, "Bill That Would Rescue Nuclear Plans Drawing Protests Across Northern Ohio," *Toledo Blade* (June 3, 2019), available at https://www.toledoblade.com/local/environment/2019/06/03/Protesters-oppose-House-Bill-6/stories/20190603170.

91.     Uncertain as to whether HB 6 would pass, Generation Now pushed out a media blitz to influence public opinion and pressure legislators to vote in favor of the bill. FirstEnergy funded this entire media campaign, wiring $9.5 million to Generation Now in April and May 2019.[23]

92.     The evidence presented in the FBI Affidavit—including text messages showing that FirstEnergy funded the entire public opinion campaign—plainly reveals FirstEnergy's central role in the media blitz, providing "further evidence of the corrupt relationship" between the Company and Householder.[24]

93.     As a result of the media campaign funded by FirstEnergy and Householder's influence within the House, HB 6 was passed on May 29, 2019. Less than a week after HB 6 was introduced in the Senate, FirstEnergy wired $2 million to Generation Now, the first of what would eventually amount to more than $7 million in secret funds to pay for polls, TV and radio commercials, and mailers.[25] In all, FirstEnergy illicitly paid approximately $15 million to back Householder's media blitz and ensure that HB 6 was signed into law. The FirstEnergy-funded strategy worked, and the Senate passed HB 6 approximately a month and a half after it was introduced, with some amendments that gave FirstEnergy Corp. the ability to decouple its energy rates from FirstEnergy's annual revenue—a further benefit to FirstEnergy that likely came as a result of the successful influence campaign.[26]

---

[23] ¶125.

[24] ¶128.

[25] ¶151.

[26] ¶¶169-70.

94.     The bribery scheme then turned to protecting the legislation from being overturned—"to corruptly ensure that HB 6 went into effect by defeating a ballot initiative."[27]

95.     Following the passage of HB 6, an article published on July 28, 2019 in the *Columbus Dispatch* exposed FirstEnergy's connection to "dark money" political contributions.[28] The article stated that the campaign to pass HB 6 "included $9.5 million in TV ads, largely from a dark-money group backing FirstEnergy, which supported salvaging its bankrupt spinoff FirstEnergy Solutions."  Once again, FirstEnergy "refused to answer questions about the contributions."  The article detailed FirstEnergy's campaign contributions to Householder-backed candidates, and quoted the executive director of the Energy and Policy Institute, a clean energy watchdog group, marveling at the amount of money spent by FirstEnergy to pass HB 6 as "astronomical."  Even so, Defendants again failed to take any action to uphold their fiduciary duties, instead ignoring blatant indications that the Company was misusing corporate funds to corrupt the political process without any disclosure or oversight.

96.     The Company and Householder entered their most intense phase of coordination in the effort to defeat a campaign to overturn HB 6 through a ballot initiative.  FirstEnergy proceeded to wire $23 million to Generation Now from the period following passage of HB 6 through October 2019.  FirstEnergy and its co-conspirators pumped the Company funds into a "Front Company" that would conceal their "criminal acts to defeat the referendum."[29]  Wire records indicate that

---

[27] ¶9.

[28] Randy Ludlow, "FirstEnergy handed out $1 million in campaign cash before nuclear bailout vote," *The Columbus Dispatch* (July 28, 2019), available at https://www.dispatch.com/news/20190728/firstenergy-handed-out-1-million-in-campaign-cash-before-nuclear-bailout-vote.

[29] ¶195.

"every penny of that $23 million came from Generation Now via [FirstEnergy] entities – specifically [FirstEnergy Service] and Energy Pass-Through."[30]

97. FirstEnergy's money was used on another "media blitz," including xenophobic advertisements about China's threatening the nation's energy security, in what has been referred to as the "sleaziest scare ad in recent memory in Ohio."[31] FirstEnergy executives met with Borges, one of the co-conspirators, to look at advertisements during this period.[32]

98. FirstEnergy and Generation Now also hired signature collection firms so that the firms would be prevented from working on the ballot initiative because of a conflict of interest.[33]

99. HB 6 went into effect on October 21, 2019, and FirstEnergy's bribery scheme was complete, successfully achieving a $1.3 billion bailout of the ailing nuclear power plants through the illicit use of the Company's funds. Borges also drove FirstEnergy CEO Jones to see signature collectors who were working on behalf of the ballot campaign.[34]

100. Householder and other co-conspirators personally benefitted from FirstEnergy money donated to Generation Now. Following the defeat of the ballot initiative, Energy Pass-Through, which was funded by FirstEnergy Service, wired $3 million to Generation Now, which then found its way to accounts controlled by Longstreth and Householder.[35] Householder helped

---

[30] ¶198.

[31] David Moore, "It's a Secret, a (c)(4) Is a Secret': Dark Money Powers $60 Million Bribery Scheme in Ohio," *Sludge* (Jul. 29, 2020), available at https://readsludge.com/2020/07/29/dark-money-powers-60-million-bribery-scheme-in-ohio/.

[32] ¶225.

[33] ¶229.

[34] ¶225.

[35] ¶244.

himself to over $100,000 in FirstEnergy funds to pay for costs associated with his residence in Florida, a personal lawsuit in 2017 and 2018, and to pay off approximately $20,000 in credit card debt in 2020.[36] Borges would comment "that it was 'insane' how much Enterprise members were making off [FirstEnergy]."[37]

101. In total, FirstEnergy paid out over $60 million in illegal bribes to secure the passage of HB 6.

### E. The U.S. Attorney's Complaint Implicates FirstEnergy in the Largest Public Bribery Scheme in Ohio History

102. On July 21, 2020, the U.S. Attorney's Office for the Southern District of Ohio announced the filing of criminal charges against Householder, Generation Now, Cespedes, Borges, and Householder associates Longstreth and Clark for a federal racketeering conspiracy to ensure the passage of HB 6. The U.S. Attorney called it the "largest bribery, money-laundering scheme ever perpetrated" in Ohio.

103. The FBI Affidavit makes clear that FirstEnergy's donations were made outside of campaign finance regulations: "The millions paid into the entity are akin to bags of cash—unlike campaign or PAC contributions, they were not regulated, not reported, not subject to public scrutiny."[38]

104. FirstEnergy executives were personally involved in these efforts. In the crucial months when FirstEnergy and Householder were pushing for HB 6's passage, Jones had at least 30 calls with Householder, and there were a total of 84 calls between them from just before when

---

[36] ¶245.

[37] ¶225.

[38] ¶18.

FirstEnergy started making payments to Generation Now in March 2017 through HB 6's passage in July 2019. [39]

105. Similarly, other Company officials had numerous phone contacts with the criminal defendants at the time FirstEnergy was making large donations to Generation Now, including FirstEnergy's Director of Ohio Affairs (188 calls) and FESC's VP of External Affairs (14 calls). These calls, as well as text messages and other communications, taken together with bank records of FirstEnergy's donations to Generation Now, "paint a clear picture of the partnership between the Enterprise and [FirstEnergy] in working towards their agreement."[40]

106. In addition, the FBI Affidavit included a description of a meeting among "members of the Enterprise and [FirstEnergy] executives, including 'the CEO of the Company'" that took place during FirstEnergy and Householder's effort to defeat the ballot initiative opposing H B6's enactment.[41] "Company brass" reviewed advertisements supporting HB 6 at that meeting.[42]

107. Moreover, Defendant Strah, who "is now the President of [FirstEnergy]," was FESC's Senior Vice President and CFO until May 2020 and signed the checks that FESC paid to Generation Now.[43]

108. In announcing the charges, U.S. Attorney David M. DeVillers and Chris Hoffman, FBI, Special Agent in Charge described the gravity of the charges. Hoffman stressed to reporters that this was a "sophisticated criminal conspiracy to enact legislation on behalf of Corporation A

---

[39] ¶182.

[40] *Id.*

[41] ¶240.

[42] ¶241.

[43] ¶82 at n. 22.

to corruptly defeat the potential ballot initiative that could've gone in front of the Ohio taxpayers." It was the "first time racketeering charges have been used on a public official in the Southern District of Ohio."

109.    During the conference, U.S. Attorney DeVillers also seemed to confirm FirstEnergy's identity as Company A stating: "Company A, provided $60 Million in return for the $1.3 billion bailout.  Everyone in this room knows who Company A is, I will not be mentioning the name of Company A because of our regulations and rules."

110.    On the same day, FirstEnergy released a statement stating that the Company had received subpoenas in connection with the investigation.

111.    In response to the announcement of the pay-to-play scandal, Governor Mike DeWine stated: "I am deeply concerned about the allegations of wrongdoing issued today by the U.S. Attorney's Office," calling it "a sad day for Ohio."  The following day, Governor DeWine asked the state legislature to "repeal and replace House Bill 6."

112.    The price of FirstEnergy stock plummeted on the news of the Company's fraud, falling to a low of just $22.85 per share on July 22, 2020, 45% below the stock's closing price on July 20, 2020 of $41.26 per share, on abnormally high trading volume.

**F.    The Fallout from the Bribery Scheme Continues**

113.    The fallout from the bribery scheme has been dramatic, severe, and destructive for FirstEnergy and will only continue to worsen as more information regarding the details of the scheme are revealed.

114.    On July 24, 2020, the Company held an earnings call for its second quarter of 2020. On the call, Jones claimed to have had no control over FES during the Relevant Period, but nonetheless admitted that "of the funds that are referenced in the Department of Justice affidavit, FirstEnergy's share of that is about 25%."

115.    On July 30, 2020, a Grand Jury in the Southern District of Ohio indicted Householder and the other arrested conspirators. *See United States v. Householder, et al.,* 1:20-cr-00077 (S.D. Ohio).[44]   The Grand Jury decision was filed just before the Ohio House of Representatives voted unanimously to strip Householder of his Speaker position—the first time in Ohio's history that the House has voted to unseat its leader.

116.    Also on that day, Rep. Bob Cupp was elected to replace indicted Larry Householder as the next speaker of the Ohio House of Representatives.  However, Cupp may also have unethical FirstEnergy ties.  According to an August 10, 2020 article, FirstEnergy "has been Cupp's sixth-highest donor, with its PAC contributing a total of $21,650 over seven elections," and Cupp was "the subject of a judicial ethics complaint involving campaign contributions from FirstEnergy."[45]

117.    On July 30, 2020, it was reported that two state Representatives were seeking to repeal a different piece of legislation, a 2019 budget bill provision that allowed FirstEnergy to combine the profits of three subsidiaries to avoid a finding that one had "significantly excessive" profits" (which, under Ohio law, would require the utility to return the excess to customers).[46]   In a statement calling for the repeal of the "Corrupt Price Gouging Budget Amendment Benefiting

---

[44] Recently, on September 3, 2020, Householder pled not guilty to the charges against him in the criminal case.

[45] David Moore, "New Ohio Speaker Has His Own Ethics Issues Involving FirstEnergy," *Sludge* (Aug. 10, 2020), available at https://readsludge.com/2020/08/10/new-ohio-speaker-has-his-own-ethics-issues-involving-firstenergy/

[46] Jeremy Pelzer, "Ohio lawmakers seek to repeal another bill benefiting FirstEnergy -- this time, over 'excessive' profits," Cleveland.com (July 30, 2020), available at https://www.cleveland.com/open/2020/07/ohio-lawmakers-seek-to-repeal-another-bill-benefiting-firstenergy-this-time-over-excessive-profits.html.

FirstEnergy," one of the bill's sponsors said that the "pay-to-play mentality has to come to an end."[47]

118.    On August 10, 2020, FirstEnergy filed a Notification of Late Filing with the SEC stating that they would not be able to file their quarterly report on time due to the "investigation, subpoenas and subsequent pending and threatened litigation."

119.    Indeed, as noted above, in addition to the criminal charges, several other lawsuits have been filed in connection with the Ohio bribery scheme, including two securities class actions: *Owens v. FirstEnergy Corp., et al.,* 2:20-cv-03785 (S.D. Ohio) and *Frand v. FirstEnergy Corp. et al.*, No. 2:20-cv-04287 (S.D. Ohio); four RICO class actions: *Smith v. FirstEnergy Corp., et al.,* 2:20-cv-03755 (S.D. Ohio), *Buldas v. FirstEnergy Corp., et al.,* 1:20-cv-00593 (S.D. Ohio), *Hudock v. FirstEnergy Corp.*, Case No. 2:20-cv-03954 (S.D. Ohio), and *Szep v. FirstEnergy Corp., et al.*, Summit C.P. No. CV-2020-07-2133; a civil racketeering lawsuit, *State of Ohio v. FirstEnergy Corp. et al.*, Franklin C.P. No. CV-20-006281; and a class action alleging, *inter alia*, gross negligence, breach of contract, and deceptive consumer acts or practices: *Emmons v. FirstEnergy Corp.*, Cuyahoga C.P. No. CV-20-935557.

120.    On August 12, 2020, the Cleveland City Council voted unanimously to launch investigations into whether the FirstEnergy corruption scandal sought to harm city-owned Cleveland Public Power.  City Council President Kevin Kelley, the primary sponsor of the

---

[47] Ohio State Rep. Michael Skindell, "Reps. Skindell, Denson Introduce HB 740 To Repeal Corrupt Price Gouging Budget Amendment Benefiting First Energy," Press Release (July 30, 2020), available at http://www.ohiohouse.gov/michael-j-skindell/press/reps-skindell-denson-introduce-hb-740-to-repeal-corrupt-price-gouging-budget-amendment-benefiting-first-energy.

resolution, noted that CPP is a competitor to FirstEnergy in Cleveland and that he intends for the investigation to include a look at lobbying by FirstEnergy.[48]

121.    On September 8, 2020, the Office of the Ohio Consumers' Counsel ("OCC")—a statewide legal representative for Ohio's residential consumers in matters related to their investor-owned electric, natural gas, telephone, and water utilities—filed a motion before the Public Utilities Commission of Ohio ("PUCO") asking PUCO to open an independent management audit and investigation of FirstEnergy.  Specifically, the OCC requested that the PUCO investigate FirstEnergy's corporate governance, its corporate relationships including its utility relationships with other FirstEnergy affiliated entities, and whether any money collected from consumers was improperly used for to pay bribes in connection with HB 6 instead of for legitimate electric utility service.  OCC also requested that PUCO hire an independent auditor to investigate FirstEnergy's bribery scheme and to publicly file a report of findings and recommendations for consumer protection.  Although a PUCO spokesperson stated that the commission will review the motion and any response filed by FirstEnergy "before making a determination on how to respond," Ashley Brown—a former member of PUCO from 1983 to 1993 and the current executive director of the Harvard Electricity Policy Group at Harvard University's John F. Kennedy School of Government—acknowledged that opening such an investigation at this juncture would be "the right thing to do."

122.    On September 15, 2020, reports surfaced that the U.S. Securities and Exchange Commission ("SEC") had launched an investigation into FirstEnergy in a probe tied to the bribery

---

[48] Robert Higgs, "Cleveland City Council OK's investigating efforts against CPP, but members want to scrutinize CPP, too," *Cleveland.com* (Aug. 13, 2020), available at https://www.cleveland.com/cityhall/2020/08/cleveland-city-council-oks-investigating-efforts-against-cpp-but-members-want-to-scrutinize-cpp-too.html.

scandal involving HB 6. The SEC's investigation—which had been concealed by the Company for months—came to light in a lawsuit FirstEnergy filed on September 1, 2020 against a former employee of a consulting company contracted by FirstEnergy who had access to internal FirstEnergy documents. The court filings in that lawsuit indicate that the former employee provided internal FirstEnergy documents to the SEC as part of the SEC's whistleblower program. In particular, the whistleblower provided the SEC with 57 confidential FirstEnergy files relating to the bribery investigation, including reviews and approvals of wire transfers and tax payments. The investigation is being led by the SEC's public finance abuse unit, which focuses on allegations of corruption involving publicly traded companies.

123. On September 23, 2020, the Ohio Attorney General filed a civil racketeering lawsuit against FirstEnergy, Householder, and other co-conspirators. The lawsuit seeks, in large part, to block FirstEnergy's two nuclear power plants from receiving the more than $1 billion ratepayer bailout enacted as part of HB 6. The lawsuit also seeks compensatory, punitive, and treble damages. At the time the lawsuit was filed, Ohio Attorney General Dave Yost stated that "Ohio laws should not be built on the basis of fraud, deceit and intimidation." Attorney General Yost further stated that "[g]iven the corruption surrounding House Bill 6, it is proper to block these ill-gotten gains from filling the coffers of those under criminal indictment."

124. The full costs to FirstEnergy from its illicit conduct are not yet known, but initial reports from analysts predict massive regulatory fines. Wolfe Research and CreditSights have estimated fines and penalties to the Company in the $500 million range. Mizuho Securities USA LLC estimates a 1.0 billion fine in connection with the Householder investigation. UBS stated that they "consider an SEC investigation a possibility (similar to what [Exelon

Corporation] faces) and we believe there is the potential for credit rating agencies to downgrade FE to non-investment grade (BBB-/Baa3)."

## V.     THE DEFENDANTS VIOLATED SECTION 14(A) OF THE EXCHANGE ACT

### A.     Defendants Issue False Proxies in Violation of Section 14(a) of the Exchange Act

125.     The Director Defendants violated Section 14(a) of the Exchange Act and SEC Rule 14a-9 by causing FirstEnergy to issue proxy statements that failed to disclose the Ohio bribery scheme or the seriously deficient internal controls and compliance practices that allowed the bribery scheme to begin and helped perpetuate it.  Director Defendants' failure to disclose those material facts likewise constitutes a breach of their fiduciary duties.

#### 1.     The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2018 Proxy

126.     On March 30, 2018, the Director Defendants caused FirstEnergy to issue its 2018 Annual Proxy Statement (the "2018 Proxy") in connection with the 2018 annual stockholders meeting to be held on May 15, 2018.  In the 2018 Proxy, these Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board, and (ii) approve executive compensation.  With respect to each of these solicited votes, the Director Defendants issued materially false or misleading statements.

127.     The 2018 Proxy was signed by Ebony L. Yeboah-Amankwah, FirstEnergy Vice President, Corporate Secretary & Chief Ethics Officer.  An opening letter accompanying the 2018 Proxy was signed by FirstEnergy President and Chief Executive Officer Jones, Board Chairman-Elect Donald T. Misheff, and Board Chairman George M. Smart.

128.     The 2018 Proxy described the Board's key role in risk oversight.  Specifically, the 2018 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks."  It detailed committees such as a "Risk Policy

Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

129.   The 2018 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

130.   Specifically, with respect to the Corporate Governance Committee, the 2018 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." According to the 2018 Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

131.   The 2018 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2018 Proxy also omitted any disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the

2018 Proxy was filed the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to Householder's relationship with FirstEnergy.

132. The 2018 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2018 Proxy Statement, FirstEnergy stockholders voted to re-elect Defendants Addison, Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Thornton to the Board.

133. With respect to the Company's compensation plan, the 2018 Proxy stated that FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking" by mitigating features such as "The mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking[.]"

134. The statements in the 2018 Proxy related to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system encouraged the risky conduct that led to the Ohio bribery scheme.

135. Under this false impression, FirstEnergy shareholders voted in support of compensation to Defendants Jones, Pearson, and Strah, totaling over $15.2 million, $5.9 million, and $3.9 million, respectively, in 2017 and causing damage to FirstEnergy, without the benefit of

material information regarding Defendants' roles in, and their failure to address, the Ohio bribery scheme.

### 2. The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2019 Proxy

136. On April 1, 2019, the Director Defendants caused FirstEnergy to issue its 2019 Annual Proxy Statement (the "2019 Proxy") in connection with the 2019 annual stockholders meeting to be held on May 21, 2019. In the 2019 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

137. The 2019 Proxy was signed by Ebony L. Yeboah-Amankwah, FirstEnergy Vice President, Corporate Secretary & Chief Ethics Officer. An opening letter accompanying the 2019 Proxy was signed by FirstEnergy President and Chief Executive Officer Charles E. Jones and Board Chairman Donald T. Misheff.

138. The 2019 Proxy described the Board's key role in risk oversight. Specifically, the 2019 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks." It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

139. The 2019 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your

Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

140.    Specifically, with respect to the Corporate Governance Committee, the 2019 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations." According to the 2019 Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

141.    The 2019 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2019 Proxy also omitted any disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2019 Proxy was filed the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to Householder's relationship with FirstEnergy.

142.    The 2019 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result

of the misleading statements in the 2019 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

143. With respect to the Company's compensation plan, the 2019 Proxy stated that FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking" by mitigating features such as "The mix of compensation among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking[.]"

144. The statements in the 2019 Proxy related to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

145. Under this false impression, FirstEnergy shareholders voted in support of compensation to Defendants Jones, Strah, and Pearson and other executives totaling over $11.1 million, $3.4 million, and $3.8 million, respectively, in 2018 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

### 3. The Director Defendants Caused First Energy to Issue Materially False and Misleading Statements in the 2020 Proxy

146. On April 1, 2020, the Director Defendants caused FirstEnergy to issue its 2020 Proxy Statement (the "2020 Proxy") in connection with the 2020 annual stockholders meeting to be held on May 19, 2020. In the 2020 Proxy, the Director Defendants solicited stockholder votes to, among other things: (i) re-elect themselves to the Board; and (ii) approve executive

compensation. With respect to each of these solicited votes, these Director Defendants issued materially false or misleading statements.

147.     The 2020 Proxy was signed by Ebony L. Yeboah-Amankwah, FirstEnergy Vice President, Corporate Secretary & Chief Ethics Officer.  An opening letter accompanying the 2020 Proxy was signed by FirstEnergy President and Chief Executive Officer Charles E. Jones and Board Chairman Donald T. Misheff.

148.     The 2020 Proxy described the Board's key role in risk oversight.  Specifically, the 2019 Proxy stated, "Your Company has implemented a process to identify, prioritize, report, monitor, manage, and mitigate its significant risks."  It detailed committees such as a "Risk Policy Committee, consisting of the Chief Risk Officer and senior executive officers, provid[ing] oversight and monitoring to ensure that appropriate risk policies are established and carried out and processes are executed in accordance with selected limits and approval levels" through the provision of "timely reports on significant risk issues" to, among others, respective Board committees and the full Board.

149.     The 2020 Proxy Statement also detailed how FirstEnergy's Audit Committee was in place to assist the Board with: "the integrity of your Company's financial statements; your Company's compliance with legal, risk management and oversight, and regulatory requirements; . . . and your Company's systems of internal control with respect to the accuracy of financial records, adherence to Company policies, and compliance with legal and regulatory requirements."

150.     Specifically, with respect to the Corporate Governance Committee, the 2020 Proxy stated that the Committee's "charter requires it to also periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate political participation, and dues and/or contributions to industry groups and trade associations."  According to the 2020

Proxy, "The Corporate Governance Committee is guided by its charter, the Corporate Governance Policies, and other applicable laws and regulations[.]"

151.    The 2020 Proxy falsely and misleadingly suggested that the Board effectively managed risk and promoted compliance with laws, and omitted any disclosures regarding: (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately address the Ohio bribery scheme; and (iii) Board-approved compensation programs that encouraged the risky conduct that led to the Ohio bribery scheme. The 2020 Proxy also omitted any disclosures reflecting or acknowledging that Director Defendants failed to address numerous red flags after they should have been aware of the misconduct. Indeed, by the time the 2020 Proxy was filed the Ohio bribery scheme was already well underway, and FirstEnergy had funneled millions of dollars to Householder in return for a financial bailout. Moreover, by this time there was already heightened scrutiny over Householder's problematic past, and multiple news reports had pointed to Householder's relationship with FirstEnergy.

152.    The 2020 Proxy harmed FirstEnergy by interfering with the proper governance on its behalf that follows stockholders' informed voting of directors and resulted in the reelection of directors who subjected FirstEnergy to significant monetary and reputational damages. As a result of the misleading statements in the 2020 Proxy, FirstEnergy stockholders voted to re-elect Defendants Anderson, Demetriou, Johnson, Jones, Misheff, Mitchell, O'Neil, Pappas, Pianalto, Reyes, and Turner to the Board.

153.    With respect to the Company's compensation plan, the 2020 Proxy stated that FirstEnergy aligned "executives' interests with the long-term interests of our shareholders without encouraging excessive risk taking" by mitigating features such as "The mix of compensation

among base salary, and short- and long-term incentive programs is not overly weighted toward short-term incentives, and thus, does not encourage excessive risk taking[.]"

154.    The statements in the 2020 Proxy related to compensation misleadingly conveyed that FirstEnergy's compensation structures encouraged long-term stockholder value, pay for performance, and good governance. In reality, FirstEnergy's compensation system actually encouraged the risky conduct that led to the Ohio bribery scheme.

155.    Under this false impression, numerous FirstEnergy stockholders voted in support of compensation to Defendant Jones, Strah, and Pearson and other executives, totaling over $14.6 million, $6.0 million,and $7.2 million, respectively, in 2019 and causing damage to FirstEnergy, without the benefit of material information regarding Defendants' role in, and their failure to address, the Ohio bribery scheme.

## VI.    THE INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

### A.    General Duties of as Officers and Directors

156.    By reason of their positions as directors and officers of FirstEnergy and because of their ability to control the business, corporate, and financial affairs of the Company, Defendants owed FirstEnergy and its stockholders fiduciary obligations of trust, loyalty, good faith, candor, and due care, and were required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner.  These duties included ensuring that FirstEnergy remained in compliance with all applicable federal and state laws, rules and regulations. Defendants must act in furtherance of the Company's best interests so as to benefit all shareholders equally and not in furtherance of any Defendants' personal interest(s) or benefit.

157.    Accordingly, Defendants were required to:

a. Ensure that the FirstEnergy was operated in a diligent, honest, and prudent manner in accordance with federal and state laws, rules and regulations, and the Company's corporate charter and bylaws;

b. Remain informed as to how FirstEnergy conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith and to take corrective and preventative steps, for the purposes of, *inter alia*, maximizing shareholder value and preserving the Company's reputation and goodwill;

c. Maintain and implement adequate financial and operational controls, such that the Company's operations would comply with all laws;

d. Ensure the accuracy of public filings through sufficient supervision of the preparation, filing, or dissemination of any SEC filings, press releases, audits, reports, or other information disseminated by FirstEnergy, and to track, monitor, and assess any reports of examinations or investigations concerning the practices, products or conduct of officers of the Company; and

e. Act with prudence and restraint, so as not to unduly benefit themselves and other FirstEnergy insiders at the expense of the Company.

158. As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on NASDAQ, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, management, earnings, and present and future business prospects; and to correct any previously-issued statements that had become materially misleading or untrue, so that

47

the market price of the Company's common stock would be based on truthful and accurate information.  The Individual Defendants' misrepresentations and omission during the Relevant Period violated these specific requirements and obligations.

    **B.**    **Obligations and Representation In the Company's Corporate Codes and Policies**

    159.    FirstEnergy's Code of Business Conduct (the "Code") applies to each of the Defendants.  The Code states:

> FirstEnergy personnel are all responsible for complying with applicable laws and regulations and the principles and provisions included in this Code. …
>
> Known or suspected violations of laws, rules, regulations or this Code are serious matters and must be dealt with accordingly….This reporting requirement includes any actual, potential or suspected violations of the securities laws (such as any accounting, investor or financial and financial reporting related matters). …
>
> *Protection of Corporate Assets, Including Corporate Funds* - We have a responsibility to use Company assets efficiently and carefully and to protect them from loss, theft, misuse, waste and carelessness, which have a direct impact on the Company's profitability. ***Company assets and funds may be used only for legitimate business purposes and may never be used for illegal purposes.*** Do not keep undisclosed funds nor establish any undisclosed accounts while conducting your work. Do not knowingly cause corporate funds to be used for unlawful purposes or for purposes other than those described by the documentation supporting payment. …
>
> *Compliance with the Law* - Comply with both the letter and spirit of all applicable U.S. and foreign laws, rules and regulations, seeking any necessary clarifications from your immediate supervisor or the Legal Department. Do not knowingly take, or permit to be taken, any action on behalf of the Company that violates any law, rule or regulation. Acknowledge that you are expected to have an understanding of the applicable laws, rules and regulations that affect our work assignments. …

    160.    As Defendant Jones himself stated:

> Maintaining high ethical standards builds trust with our customers, shareholders, fellow personnel, and the communities we serve. At FirstEnergy, we are all responsible for upholding high standards and being aware of ethical issues that we may face on the job. Our Code of Business Conduct communicates the fundamentals of ethical behavior in the workplace and provides important guidelines to ensure we maintain our high standards. It applies equally to all

FirstEnergy personnel, including the Chief Executive Officer, Chief Financial Officer and Chief Accounting Officer.

161. The Company's Corporate Governance Policies states in unequivocal terms:

The Board believes that the long-term success of the Company is dependent upon the maintenance of an ethical business environment that focuses on adherence to both the letter and the spirit of regulatory and legal mandates.

Board and committee agendas and materials are established with legal and regulatory requirements in mind. The Board expects that … that *management will acknowledge adherence to and conduct operations consistent with the Code of Business Conduct*…

162. Under the Company's Political Activity Policy, the Defendants' also had duties to identify and report illegal or unethical business practices within the Company:

Under federal law, there are limits on a corporation's ability to give direct corporate contributions to federal candidates and national political parties. Accordingly, *FirstEnergy does not contribute corporate funds directly to federal political candidates or parties.*

Each state has different laws, rules and regulations governing political contributions in state and local elections. *Any corporate political contributions by FirstEnergy are made in accordance with applicable laws, rules and regulations.*

163. Further, a number of board committees exist that monitor specific aspects of FirstEnergy's business. These include the Audit Committee; the Compensation Committee; the Corporates Govern acne and Corporate Responsibility Committee; the Finance Committee; and the Operations, Safety and Nuclear Oversight Committee.

164. Defendants Johnson, Misheff, Mitchell, and Reyes sit on the Corporate Governance and Corporate Responsibility Committee. Under the Charter of the Corporate Governance and Corporate Responsibility Committee, its Committee is obliged to periodically review the Company's Corporate Political Activity Policy, including practices relating to corporate participation, and dues and/or contributions to industry groups and trade associations."

49

165.    Defendants O'Neil, Pappas, Pianalto, and Turner currently comprise the Compensation Committee.  Under the Charter of the Compensation Committee, the Compensation Committee's purpose is to, among other things, "review, discuss, and endorse a compensation philosophy and objectives that support competitive pay for performance and are consistent with the corporate strategy," and "assist the Board in establishing the appropriate annual salary, incentive compensation and equity-based plans for the Company's Section 16 Officers, remaining Executive Council members, and certain other senior-level officers . . . and to align such plans with Company and business unit performance, business strategies and growth in shareholder value."

166.    Defendants Anderson, Misheff, Pianalto, and Turner presently comprise the Audit Committee.  Under the Audit Committee Charter, its purpose is to, among other matters, "assist the Board with oversight of (i) the integrity of the Company's financial statements; (ii) the Company's compliance with legal, risk management and regulatory requirements. . . . and (v) the Company's systems of internal controls with respect to the accuracy of financial records, adherence to Company policies and compliance with legal and regulatory requirements."  The Committee is obliged to "review and discuss the annual audited financial statements and quarterly financial statements with management and the independent auditor," "oversee, require and review periodic evaluations of the Company's internal control and corporate compliance structures," and to "oversee, assess, discuss, and review the Company's policies with respect to the Company's . . . assessment and management of risks . . . ." The Audit Committee's Charter also states:

> Periodically, the Committee shall meet with appropriate members of management to review adherence to applicable federal, state, and local laws and corporate policies and review processes relating to training, monitoring and reporting of policy compliance. ***In particular, the Committee shall review the Company's Code of Business Conduct to determine that it is designed to provide adequate protection against violations of applicable laws and regulations, and shall review***

50

*the record keeping and reporting systems to measure and monitor regulatory compliance requirements.*

167.    Defendants failed to meet their responsibilities and obligations as set forth above. Defendants' illegal course of conduct constituted breaches of their fiduciary duties to FirstEnergy, as well as violations of state and federal law, and resulted in significant harm to the Company.

## VII.    DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

168.    Plaintiff is a current owner of FirstEnergy common stock and was a continuous owner of FirstEnergy common stock during the Relevant Period.

169.    The Company is named in this action solely as a nominal party.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

170.    Plaintiff brings this action derivatively to redress injuries suffered, and to be suffered, by the Company as a direct result of the breaches of fiduciary duty, unjust enrichment, gross mismanagement, contribution and indemnification, and violations of Section 14(a) of the Exchange Act.

171.    Plaintiff will adequately and fairly represent the interests of FirstEnergy in enforcing and prosecuting its rights, and has retained counsel who are competent and experienced in stockholder derivative litigation.  Prosecution of this action is in the best interests of the Company.

172.    As a direct and proximate result of Defendants' misconduct, FirstEnergy has endured serious harms.  These harms range from reputational harms and injury to FirstEnergy's goodwill and credibility, which may result in impairment of the Company's future ability to raise debt or equity capital on favorable terms.  Moreover, as a direct and proximate result of Defendants' misconduct, FirstEnergy has been named a defendant in various civil lawsuits brought by the Ohio AG, ratepayers, and shareholders, and is also now the subject of federal investigation.

FirstEnergy will incur costs in defending against, and the potential settlement of, these civil and criminal legal and regulatory proceedings brought against the Company related to the Ohio bribery scheme.

173.    The full costs to FirstEnergy arising from the illicit bribery scheme are not yet known, but initial reports from analysts suggest that regulatory fines will be massive—ranging anywhere from the $500 million range (Wolfe Research; CreditSights) to $1 billion dollars (Mizuho).

174.    The FirstEnergy Board, at the time of filing of this action, consisted of the eleven Director Defendants.  Demand is futile because at least a majority of those eleven directors are conflicted, and cannot disinterestedly or independently consider a demand.

175.    As alleged above, the Defendants breached their fiduciary duties by (i) failing to properly monitor the Company's core operations and the conduct of its executives, which led to FirstEnergy's involvement in the Ohio bribery scheme; (ii) failing to disclose to shareholders material adverse information regarding FirstEnergy's business and in fact acting to limit the amount of information to be disclosed to shareholders; and (iii) consciously disregarding numerous red flags related to the Ohio bribery scheme.

176.    Plaintiff has not made any demand upon the FirstEnergy Board to institute this action against the Individual Defendants because, for the reasons described below, any such demand would have been futile and useless, and is therefore excused.

**A.     Demand is Excused Because the Director Defendants Face a Substantial Likelihood of Liability**

177.    Demand is excused because the Director Defendants face a substantial likelihood of liability for the claims asserted against them in this Complaint, given their awareness of or

conscious disregard of significant red flags relating to the Ohio bribery scheme; and their failure to ensure that FirstEnergy's internal controls and compliance functions were functioning.

        1.      **Demand is Futile Because the Director Defendants Face a Substantial Likelihood of Liability for Securities Laws Violations**

     178.    The Director Defendants each face a substantial likelihood of liability for their actions described herein, rendering any demand upon them futile. Each participated in and/or caused the issuance of the 2018, 2019, and 2020 Proxies described above. These Proxies inaccurately assured the investing public that the Board maintained effective risk management controls. These Proxies lacked disclosures of (i) the ineffective internal and disclosure controls at the board level; (ii) the reporting failures that failed to address serious and illegal misconduct by senior executives; and (iii) the fact that the Company actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices. The Director Defendants had knowledge of undisclosed material facts alleged herein and knowingly or consciously disregarded them and acted in bad faith by releasing the false and misleading Proxies.

     179.    Moreover, several of the Directors acted to ensure that the Company's disclosures will lack important information regarding the Company's lobbying efforts, which would have revealed the illegal conduct. In March 2017, Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, Pappas, and Reyes voted against a shareholder proposal which sought transparency and accountability on lobbying policies and payments. Had that proposal gone through, the Ohio bribery scheme would have been disclosed to shareholders. The prior two years, Defendants Anderson, Johnson, Jones, Misheff, Pappas, and Reyes had also successfully recommended that shareholders vote against substantially similar proposals.

     180.    The Company filed its 2017 proxy statement with the SEC on March 31, 2017 (the "2017 Proxy"), which included a shareholder proposal requiring an annual report disclosing the

lobbying policies and payments (the "2017 Lobbying Proposal"). Propounded by The Nathan Cummings Foundation, the 2017 Lobbying Proposal noted that "full disclosure of our company's direct and indirect lobbying activities and expenditures is required to assess whether FirstEnergy's lobbying is consistent with its expressed goals and in the best interests of shareholders." The Nathan Cummings Foundation further noted that the Company did not choose to disclose its lobbying payouts, whereas the Company disclosed its federal lobbying payouts exceeded $4 million in 2014 and 2015. The silence on state lobbying posed a "reputational risk." In a prescient note, the Nathan Cummings Foundation observed that "absent a system of accountability, company assets could be used for objectives contrary to FirstEnergy's long-term interests." As a result, the 2017 Lobbying Proposal asked that the Company prepare annual reports disclosing:

> 1. Company policy and procedures governing lobbying, both direct and indirect, and grassroots lobbying communications.
>
> 2. Payments by FirstEnergy used for (a) direct or indirect lobbying or (b) grassroots lobbying communications, in each case including the amount of the payment and the recipient.
>
> 3. FirstEnergy's membership in and payments to any tax-exempt organization that writes and endorses model legislation.
>
> 4. A description of the decision-making process and oversight by management and the Board for making payments described in sections 2 and 3 above.

181. The report was to be presented to the Audit Committee or other relevant oversight committee and posted on FirstEnergy's website.

182. Defendants Jones, Anderson, Demetriou, Johnson, Misheff, Mitchell, Pappas, and Reyes reacted by recommending that shareholders vote against the 2017 Lobbying Proposal, and instead rely on the existing disclosure framework, under which many state lobbying efforts could

remain undisclosed. Indeed, that lack of disclosure meant that the market was not told the amounts that FirstEnergy would supply (and was already supplying) to Householder.

183. The Company's Board has evinced, through its 2015, 2016, and 2017 recommendations to vote against shareholder purposes to increase lobbying transparency, serious opposition to disclosing the Company's payments to state public officials. Moreover, in 2017, just months after the Ohio bribery scheme began, a majority of the current Board recommended that shareholders vote against a proposal that would have required disclosure of the illegal payments at issue. The Board, in the face of knowledge and notice that payments to state officials by the Company required monitoring and disclosure, rejected an effort at greater transparency. Thus, demand on the current Board to take action in response to the illegal payments would be futile.

### 2. The Director Defendants Face a Substantial Likelihood of Liability for Failing to Exercise Their Fiduciary Duties to FirstEnergy

184. The Director Defendants failed to institute and maintain an internal, board-level monitoring system that would prevent or monitor illegal conduct. The Director Defendants also failed to respond to red flags that indicated illegal conduct. Knowledge of the red flags is further imputed to the Board through various committees tasked with specific and enhanced monitoring and oversight duties, including the oversight of the lobbying efforts that diverted $60 million from Company coffers to the Enterprise. Duties of the various committees included, among other things, legal and regulatory oversight, ensuring the safety and soundness of the Company's business practices, responsiveness to whistleblower complaints, and ensuring that the Company's compensation structure did not encourage excessive risk taking. Each Board Committee was responsible for reporting to the Board concerning these issues.

185. During the Relevant Period, Director Defendants Anderson, Misheff, Pianalto, and Turner served as members of the Audit Committee and had responsibility for, *inter alia*, reviewing

the Company's annual and quarterly financial reports, reviewing the integrity of the Company's internal controls, and ensuring that the Company was in compliance with legal and regulatory regimes.

186.     There is no doubt that the illegal conduct was a result of systemic control failures at the Company.  Defendants Anderson, Misheff, Pianalto, and Turner failed to preserve the integrity of the Company's internal controls, ignored red flags, and also allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures, and caused or allowed the illicit activity described herein.  As a direct and proximate result, the Company became embroiled in the Ohio bribery scheme and become the subject of investigations by the U.S. Attorney and FBI. Therefore, Defendants Anderson, Misheff, Pianalto, and Turner face a substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

187.     During the Relevant Period, Defendants O'Neil, Pappas, Pianalto, and Turner served as members of the Compensation Committee. Pursuant to the Compensation Committee Charter, the members of the Compensation Committee were and are responsible for, developing and reviewing Company's compensation system, as well as assessing risks related to the compensation system. Defendants O'Neil, Pappas, Pianalto, and Turner breached their fiduciary duties of due care, loyalty, and good faith, because the Compensation Committee, *inter alia*, allowed or permitted the Company to engage in the illicit activity described herein, and encouraged risky conduct through the Company's compensation system, which ultimately led the Company to become embroiled in the Ohio bribery scheme and become the subject of investigations by the U.S. Attorney and the FBI. Therefore, Defendants O'Neil, Pappas, Pianalto, and Turner face a

substantial likelihood of liability for their breach of fiduciary duties, and any demand upon them is futile.

188.    Demand is also excused because the Board's complicity in the bribery scheme constitutes unlawful activity or the facilitation of unlawful activity. The Board flouted their duties by affirmatively adopting, implementing, and/or condoning a business strategy based on violations of law and/or statutes (federal and/or state). Illegal or illicit conduct is not protected under the business judgment rule, and may not be later ratified. Given the size of the contributions, Director Defendants knew or should have known that $60 million moved out of the Company in exchange for a billion-dollar kickback.

189.    In order to properly prosecute this lawsuit, it would be necessary for the directors to sue themselves and the other defendants, requiring them to expose themselves and their comrades to millions of dollars in potential civil liability and criminal or SEC sanctions. This they will not do.

190.    For these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

### B.    Demand is Excused Because Certain Directors Are Not Independent

191.    Defendant Jones is not an independent director under NYSE listing standards, due to his employment by the Company as its CEO, pursuant to which he receives substantial monetary compensation and other benefits. Moreover, in addition to FirstEnergy, Defendant Jones has been named as a defendant in the Securities Class Actions.

192.    Also, as detailed above, Defendant Jones lacks independence because he faces a substantial likelihood of liability for his individual misconduct. Further, Jones has already publicly

defended the Company and its actions in connection with the Ohio bribery scheme, and stated that the Company is innocent and that it acted ethically. Thus, a demand on Jones would be futile.

193. Moreover, many of the directors serve together on other boards, which compromises their judgment and ability to be independent from each other. For example, Directors Misheff and Pappas serve together on the Trinseo S.A. board of directors, Misheff since February 2015 and Pappas since October 2010. Pappas in fact served as Trinseo's President and CEO from June 2010 through March 2019, and he is currently a Special Adviser to Trinseo's President and CEO. Directors Misheff and Demetriou served together on the Aleris Corporation board of directors, Misheff from December 2013 through April 2018, and Demetriou as Chairman and CEO from 2004 through 2015. Misheff also is a director on the TimkenSteel Corporation board. FirstEnergy's Executive Vice President of Corporate Strategy, Regulatory Affairs and Chief Legal Officer from May 2016 through April 2019, Leila Vespoli, also serves on TimkenSteel's board. TimkenSteel, an Ohio-headquartered steel manufacturer, publicly advocated for the passage of HB 6. A TimkenSteel senior executive, Joe Price, testified before the Ohio House Energy and Natural Resources Committee on May 15, 2019, in support of HB 6 for "most significantly," eliminating a mandate that required the purchase of renewable energy, which he said created costs to the company that were "significant" and "rising."[49] TimkenSteel also supported Householder, donating $5,000 to his Friends of Householder PAC in February 2020.

_____

[49] Testimony of Joe Price, Senior Manager of Government Affairs & Energy Commodity, before the Energy and Natural Resources Committee, Ohio House of Representatives (May 15, 2019), available at http://search-prod.lis.state.oh.us/cm_pub_api/api/unwrap/chamber/133rd_ga/ready_for_publication/committee_docs/cmte_h_energy_1/testimony/cmte_h_energy_1_2019-05-15-0900_583/testimony_proponent_joeprice_timkensteel_5.15.2019.pdf.

194.    For all of these reasons, the Board is incapable or unwilling to take the actions required to seek the relief requested in this Complaint. Because a majority of the Board faces a substantial risk of liability, demand is futile.

## VIII.    CLAIMS

### COUNT I
### (Breach of Fiduciary Duty Against The Director Defendants)

195.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

196.    Each of the Director Defendants owed and owe fiduciary duties to the Company and its stockholders—specifically, the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

197.    As set forth in this Complaint, each of the Director Defendants violated and breached their fiduciary duties of candor, good faith, loyalty, and reasonable inquiry to the Company by failing to monitor and consciously ignoring numerous red flags related to the Ohio bribery scheme.  Their conduct was characterized by intentional, reckless, or grossly negligent breaches of the fiduciary duties they owed to FirstEnergy to protect its rights and interests.

198.    Additionally, the Director Defendants have specific duties as defined by the Company's corporate governance documents, including the charters of various Board committees, and had they been discharged in accordance with the Director Defendants' obligations, it would have necessarily prevented the misconduct and the consequent harm to the Company alleged in this Complaint.

199.    Further, as alleged in detail herein, each of the Director Defendants (and particularly the Defendants on the Audit Committee) had a duty to ensure that FirstEnergy

disseminated accurate, truthful, and complete information to its shareholders. Defendants violated their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to FirstEnergy shareholders materially misleading and inaccurate information through, *inter alia*, FirstEnergy's SEC filings and other public statements and disclosures as detailed herein, which failed to disclose that the Company was being operated in an unlawful and/or illicit manner. These actions could not have been a good faith exercise of prudent business judgment.

200. Accordingly, to the extent any FirstEnergy exculpatory provision applies to the Director Defendants' acts or omissions while acting in their capacity as directors, it cannot immunize them from (i) any non-monetary liability; (ii) monetary liability for their breaches of the duty of loyalty; (iii) monetary liability for acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law; or (iv) monetary liability in connection with any transaction from which they derived an improper personal benefit. As detailed in this Complaint, the Director Defendants' misconduct with respect to the Ohio bribery scheme: (i) involved breaches of their duty of loyalty; and/or (ii) involved acts or omissions not in good faith or that involved intentional misconduct or a knowing violation of law. FirstEnergy's exculpatory provision therefore cannot immunize the Director Defendants from liability for that misconduct.

201. As a direct and proximate result of the Director Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

202. As a result of the misconduct alleged in this Complaint, the Director Defendants are liable to the Company.

## COUNT II
### (Breach of Fiduciary Duty Against the Officer Defendants)

203.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

204.    This Count is brought against the Officer Defendants solely in their capacity as officers of FirstEnergy.

205.    The Officer Defendants owed and owe fiduciary duties to FirstEnergy and its stockholders. By reason of this fiduciary relationship, the Officer Defendants specifically owed and owe FirstEnergy the highest obligation of good faith, fair dealing, loyalty, and due care in the administration and management of the affairs of the Company, including the Company's financial reporting, internal controls, and compensation practices.

206.    The Officer Defendants consciously and deliberately breached their fiduciary duties of candor, good faith, and loyalty by either intentionally causing the Company to issue false proxy statements or consciously ignoring numerous red flags related to the Ohio bribery scandal.

207.    These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

208.    Additionally, the Officer Defendants are not entitled to claim any immunity under ORC 1701.59(E) to the extent this claim is asserted against them in their capacity as officers of the Company.

209.    As a direct and proximate result of the Officer Defendants' breaches of their fiduciary obligations, FirstEnergy has sustained and continues to sustain significant damages.

210.    As a result of the misconduct alleged in this Complaint, the Officer Defendants are liable to the Company.

## COUNT III
### (Unjust Enrichment Against Individual Defendants)

211.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth in this paragraph.

212.    By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of FirstEnergy in the form of, *inter alia¸* salaries, bonuses, stock options, and/or other forms of executive compensation.

213.    Plaintiff, as a stockholder and representative of FirstEnergy, seeks restitution from Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by Defendants due to their wrongful conduct alleged in this Complaint.

## COUNT IV
### (Contribution and Indemnification Against Defendants)

214.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

215.    FirstEnergy is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein that give rise to Defendants' liability to FirstEnergy.

216.    FirstEnergy's alleged liability on account of the wrongful acts, practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and FirstEnergy is entitled to contribution and indemnification from each Defendant in connection with all such claims that have been, are or may in the future be asserted against, FirstEnergy by virtue of the Defendants' misconduct.

### COUNT V
**(Violation of Section 14(a) of the Exchange Act and SEC Rule 14a-9**
**Against the Director Defendants)**

217. Plaintiff incorporates by reference and realleges each of the foregoing allegations as though fully set forth herein.

218. This claim is based solely on negligence, not on any allegation of reckless or knowing conduct by or on behalf of the Director Defendants. Plaintiff does not allege, rely on, or reference any allegations of fraud, scienter, or recklessness with regard to this claim.

219. SEC Rule 14a-9 (17 C.F.R. § 240.14a-9), promulgated under Section 14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any proxy statement form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

220. The Director Defendants negligently issued, caused to be issued, and participated in the issuance of materially misleading written statements to shareholders which were contained in the 2018, 2019, and 2020 Proxies.

221. The Proxies contained proposals to FirstEnergy shareholders urging them to elect and re-elect members of the Board and provide advisory votes on issues relating to executive compensation. These Proxies, however, misleadingly suggested that the Board maintained effective risk management and omitted any disclosures regarding (i) FirstEnergy's ineffective internal and disclosure controls; (ii) reporting failures that failed to appropriately disclose a culture of complicity over compliance within FirstEnergy; and (iii) the fact that FirstEnergy actually encouraged, and consistently rewarded, extreme risk-taking and illegal practices.

222.    By reason of this conduct, the Director Defendants violated Section 14(a) of the Exchange Act. As a direct and proximate result of this wrongful conduct, FirstEnergy misled its shareholders by making misleading statements that were an essential link in shareholders following the Company's recommendations to re-elect and elect the current Board and to provide advisory votes approving of the executive compensation.

223.    The false and misleading information contained in the Proxies was material to shareholders' decisions whether to vote in favor of the current Board and whether to provide advisory votes on executive compensation.  Plaintiff, on behalf of FirstEnergy, thereby seeks relief for harm inflicted upon the Company as a result of the misleading Proxy Statements.

224.    This action was timely commenced within one year from the time Plaintiff discovered or reasonably could have discovered the facts on which this claim is based, and in any case within three years of the date of each Proxy Statement.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully asks the Court for judgment against all Defendants as follows:

A.    Declaring that Plaintiff may properly maintain this derivative action on behalf of FirstEnergy, that Plaintiff is an adequate representative for the Company, and that demand is excused as futile;

B.    Declaring that the Individual Defendants have breached their fiduciary duties to FirstEnergy;

C.    Determining and awarding to FirstEnergy the damages it sustained as a result of the violations set forth above from each Individual Defendant, jointly and severally, together with prejudgment and post-judgment interest thereon;

D.    Directing FirstEnergy and Individual Defendants to take all necessary actions to

reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders from the recurrence of the damaging events described in this Complaint, including putting forward for a stockholder vote resolutions for remedial amendments to the Company's By-Laws or Articles of Incorporation, and taking such other actions as may be necessary;

E.       Extraordinary equitable or injunctive relief as permitted by law or equity, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the Individual Defendants' assets so as to assure that Plaintiff, on behalf of FirstEnergy, has an effective remedy;

F.       Awarding to FirstEnergy restitution from each of the Individual Defendants and the group, and ordering them to disgorge all inequitable profits, benefits, and other compensation obtained;

G.       Ordering an accounting of all compensation awarded to the Individual Defendants during the Relevant Period;

H.       Awarding Plaintiff costs and disbursements related to this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

I.       Granting such other and further relief as the Court deems just and proper.

## X.    JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.


Dated:  September 30, 2020                    Respectfully submitted,

                                             */s/ John C. Camillus*
                                             **LAW OFFICES OF JOHN C. CAMILLUS LLC**
                                             John C. Camillus       (0077435)
                                             P.O. Box 141410
                                             Columbus, OH 43214
                                             (614) 992-1000
                                             jcamillus@camilluslaw.com

**BERNSTEIN LITOWITZ BERGER
& GROSSMANN LLP**

Mark Lebovitch          (pro hac vice forthcoming)
Hannah Ross             (pro hac vice forthcoming)
Scott R. Foglietta      (pro hac vice forthcoming)
Jacqueline Y. Ma        (pro hac vice forthcoming)
Rebecca N. Kim          (pro hac vice forthcoming)
1251 Avenue of the Americas
New York, NY 10020
(212) 554-1400

*Counsel for Electrical Workers Pension Fund, Local
103, I.B.E.W.*